Anthony G. CORKILL, M.D.,
Plaintiff–Appellant,

v.

Donna E. SHALALA, Secretary of
Health and Human Services,
Defendant–Appellee.

No. 95–16148.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1996.

Memorandum Filed Dec. 9, 1996.

Order and Opinion Filed March 26, 1997.

James F. Geary and Stephen C. Ruehmann, Hunter, DiBenedetto & Brewer, Sacramento, California; Margaret M. Manning, Margolis & Manning, Santa Monica, California, for plaintiff-appellant.

Edmund F. Brennan, Assistant United States Attorney, Sacramento, California, for defendant-appellee.

## ORDER

The Memorandum Disposition filed December 9, 1996 is redesignated as a published Opinion.

Before: SKOPIL and FLETCHER, Circuit Judges, and RHOADES,* District Judge.

## OPINION

RHOADES, District Judge:

The Secretary of the Department of Health and Human Services sanctioned

* Honorable John S. Rhoades, Senior United States District Judge for the Southern District of California, sitting by designation.

Plaintiff/Appellant Anthony G. Corkill, M.D. ("Corkill"), for violations of 42 U.S.C. § 1320c–5 with the penalty of three years exclusion from the Medicare reimbursement program. Corkill appealed to the United States District Court for the Eastern District of California. The District Court, David F. Levi, J., affirmed the Departmental Appeals Board of the United States Department of Health and Human Services. Corkill appeals the final decision of the District Court. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Anthony Corkill is a neurosurgeon in private practice in Redding, California. Because Corkill participates in the federal Medicare reimbursement program, his practice is subject to peer review by California Medical Review, Inc. ("CMRI"). CMRI is a peer review organization ("PRO") under contract with the Department of Health and Human Services to review Medicare services in California.

In order to qualify for reimbursement under the Medicare program, a physician must comply with three statutory requirements. The physician must provide services "only when, and to the extent, medically necessary." 42 U.S.C. § 1320c–5(a). The services provided must be of a quality which meet professionally recognized standards of care. *Id.* Services performed must also be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a PRO in the exercise of its duties and responsibilities. *Id.*

PROs are responsible for determining whether the services Medicare physicians provide are reasonable, medically necessary, economical, and in accordance with professionally recognized standards of care. *See* 42 U.S.C. § 1320c–3. A physician's failure to comply with these three statutory requirements may result in a sanction of exclusion from the Medicare program. If the PRO determines that the physician has "failed in a substantial number of cases substantially to comply" with the statutory requirements, the PRO must submit a report and make recommendations to the Secretary of Health and Human Services. 42 U.S.C. § 1320c–5(b)(1).

The Secretary may exclude the physician from the Medicare program if the Secretary agrees with the PRO recommendations and also determines that the physician "has demonstrated an unwillingness or lack of ability substantially to comply" with the statutory requirements. *Id.*

CMRI took action against Corkill for failure to substantially comply with all three statutory obligations. CMRI claimed that Corkill's services failed to meet a professionally recognized standard of care in five cases and that his services were not justified by documented evidence of medical necessity in four cases. All nine cases were cases in which Corkill performed Steffee spinal stabilization surgeries. CMRI concluded that Corkill's failure to comply with the statute was substantial and recommended a ten year suspension based on the nine cases. On September 22, 1992, CMRI issued its report and recommendations to the Secretary. On January 20, 1993, the Secretary issued a determination that Corkill had violated his statutory obligations and sanctioned Corkill with a three year exclusion from the Medicare program.

Corkill filed an administrative appeal pursuant to 42 U.S.C. § 1320c–5(b)(4). An administrative law judge ("ALJ") conducted an evidentiary hearing May 17–19, 1993. The Secretary presented testimony of three expert witnesses at the hearing: Frances Conley, M.D., Russ Nockels, M.D., and Kent Michael Patrick, M.D. The witnesses testified from portions of the patients' medical records and opined, based on these records, that Corkill's services fell below the professional standard of care.

The ALJ issued a decision on October 14, 1993 affirming the Secretary's sanction. On February 23, 1994, the Departmental Appeals Board denied Corkill's request for review of the ALJ's decision. Corkill appealed to the United States District Court for the Eastern District of California. The District Court had jurisdiction under 42 U.S.C. § 405(g). The District Court affirmed the ALJ's decision on April 17, 1995.

## I. Standard of Review

■ This court's review is limited to a determination of whether the Secretary's final decision is supported by substantial evidence-evidence "such that a reasonable mind may accept it as adequate to support a conclusion." *Travers v. Shalala,* 20 F.3d 993, 996 (9th Cir.1994). The Secretary's decision should only be disturbed if it is not supported by substantial evidence or it is based on legal error. *Hermes v. Secretary of Health & Human Servs.,* 926 F.2d 789, 790 (9th Cir.), *cert. denied,* 502 U.S. 817, 112 S.Ct. 71, 116 L.Ed.2d 45 (1991). If the evidence as a whole can support a decision in favor of either party, the court must not substitute its own judgment for that of the Secretary. *Id.*

## II. Discussion

■ On five different occasions, Corkill performed a Steffee stabilization procedure without attempting a bone graft. There is substantial evidence in the record that professional standards of care require a neurosurgeon to attempt a bony fusion whenever performing spinal surgery to install a Steffee fixation system. Corkill admits that he failed to attempt a bony fusion on five occasions, but claims that under some circumstances it is justifiable to perform a stabilization without a bone graft.

There is substantial evidence in the record, consisting of the expert testimony of Dr. Nockels, Dr. Conley, and Dr. Patrick, that the professional standard of care with respect to spinal stabilizations almost always requires the surgeon to attempt to perform a bone graft when performing a Steffee stabilization: Dr. Patrick testified that "once the decision has been made to use a plate it goes hand in glove with doing a fusion." Failure to fuse the spine puts the patient at risk of possible damage to the nerve roots and inevitably leads to subsequent surgery, unless the patient dies before the fixation wiggles loose. Dr. Patrick testified that if the surgeon does not fuse the spine, the Steffee plate is guaranteed to "fall apart." Drs. Nockels and Conley gave similar testimony at the administrative hearing. The experts agreed that there are limited exceptions where a surgeon might justifiably perform a stabilization without a graft, but there is substantial evidence in the record that the circumstances in the five cases at issue did not justify Corkill's failure to perform a bone graft.

■ The Secretary also sanctioned Corkill for substantial repeated violations of a second statutory obligation, the requirement that a physician document the medical necessity of procedures that the physician performs. This overlaps with the statutory requirement that a physician provide services only when, and to the extent, medically necessary. There is substantial evidence in the record that the general professional standard for documentation requires a surgeon to explain in writing: (1) the condition or conditions which led to the conclusion that surgery should be performed; (2) whether the patient's condition or conditions justified the surgery that was performed; and (3) the surgery which was performed and the manner in which it was accomplished. Dr. Patrick summarized that: "Common sense dictates that you have to put down what you're doing and why you're doing it.... One can read a record and say all the ingredients are there to justify what happened, or they're not all there."

There is ample evidence in the administrative record that Corkill's documentation did not establish the medical necessity of the surgeries he performed. The record shows that Corkill's records did not (1) adequately describe his patients' symptoms, (2) adequately describe his diagnosis techniques, or (3) adequately explain the basis of his conclusions that his patients required spinal surgery. The experts explain these deficiencies in detail with respect to each of the four cases for which Corkill was sanctioned.

■ There is also substantial evidence that Corkill was unable or unwilling to enter into a corrective action plan. The statute permits the Secretary to exclude a physician who has violated statutory obligations if the physician "has demonstrated an unwillingness or a lack of ability substantially to comply with [the statutory quality and documentation] obligations." 42 U.S.C. § 1320c–5(b)(1). CMRI offered Corkill an opportunity to agree to a corrective action plan on two

occasions. The plan that CMRI proposed would have required Corkill to: document sufficient information so as to enable peer reviewers to determine the necessity of a given procedure, cease performing stabilization surgery unless accompanied by fusion surgery, and provide a monthly list of Steffee stabilization patients for six months so that CMRI could monitor Corkill's patient care. Corkill refused to agree to such a plan because CMRI representatives refused to enumerate more specific standards against which his practice would be evaluated. Corkill claimed that CMRI's standards were too vague: "I had no faith in their corrective action plan and they never enunciated the terms in a manner that we felt we could comply with."

There is no legal basis for Corkill's challenge to the adequacy of the plan CMRI proposed. Neither the statutes nor the regulations contain provisions governing the minimum requirements of a PRO corrective action plan. There is no specificity requirement. There is substantial expert testimony in the record that professionally recognized standards of care exist despite the fact that they are not always reduced to writing. The specific documentation requirements will vary from patient to patient depending on the patient's symptoms, the physician's diagnosis strategy, and the physician's professional conclusions. The terms of the plan that CMRI proposed were consistent with the professional standards that the experts identified at the administrative hearing.

■ Corkill offers a number of arguments challenging the adequacy of the record based on documents or evidence that never became part of the administrative record. None is persuasive. Corkill argues that the Secretary's decision is not supported by substantial evidence because the Secretary never transmitted to the ALJ all of the documents it considered in the sanction process. Neither the statutes nor the regulations require the Secretary to do so.

Corkill contends that there is no substantial evidence to support the Secretary's decision because the Secretary failed to submit patient x-rays into evidence at the administrative hearing. Corkill did not attempt to admit x-rays into evidence at the administrative hearing. Corkill does not explain how the information in the x-rays would change the outcome of the case. His only argument is that the experts qualified their opinions because of the lack of x-rays. Although the experts testified that they would consult x-rays before determining whether to perform surgery on a patient, none of the experts who testified at the hearing declined to offer an opinion because of the absence of the patient x-rays. The omission of the x-rays does not preclude a finding that the Secretary's final decision is supported by substantial evidence.

■ Corkill argues that the Secretary has failed to establish "substantial violations in a substantial number of cases" because the nine cases at issue do not reflect a "random sample" of the surgeries that he performed; they only represent the most difficult cases at "one extreme of the continuum." The regulations define "substantial violation in a substantial number of cases" as "a pattern of care has been provided that is inappropriate, unnecessary, or does not meet recognized professional standards of care, or is not supported by the necessary documentation of care as required by the PRO." 42 C.F.R. § 1004.1(b). The regulations do not require CMRI to take a random sample; they only require CMRI to establish a pattern. According to the Secretary's interpretation of the statute, nine out of seventy-five cases is sufficient to establish a pattern. In interpreting the statute, we give great deference to the interpretation given by the officers or agency charged with its administration. *Avol v. Secretary of Health & Human Servs.*, 883 F.2d 659, 661 (9th Cir.1989). We agree with the Secretary's interpretation.

■ Corkill argues that CMRI failed to provide an "opportunity for discussion" where he could meet with a "peer" to discuss his views. Corkill defines "peer" as "a neurosurgeon or orthopaedic surgeon experienced in spinal surgery." Neither the statute nor the regulations, however, require CMRI to provide a meeting with such a peer. The regulations only require CMRI to extend an "invitation to submit additional information to or discuss the problem *with representatives of the PRO.*" 42 C.F.R. § 1004.40(c)(6) (emphasis added). *See also* 42 C.F.R. § 1004.50(b)(6). The regulations do not require the attendance of the CMRI

specialists who conducted the review of the sanctioned surgeon. The regulations do not require that this representative be a specialist in the same field as the physician under review. The regulations only require attendance of a PRO representative to explain the PRO's position.

III. *Conclusion*

There is substantial evidence in the record that Corkill's surgical procedures fell below the professional standards of care with respect to documentation and failure to perform bony fusions. There is substantial evidence that Corkill failed to establish the medical necessity of four of the surgeries that he performed. There is substantial evidence that Corkill refused to agree with CMRI on a corrective action plan. The decision of the District Court is therefore

AFFIRMED.